## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ANDRE FLETCHER,** | **Case No. 2:21-cv-02509-JDW** |
| *Plaintiff,* | |
| v. | |
| **INFRAMARK, LLC,** | |
| *Defendant.* | |

## MEMORANDUM

Andre Fletcher claims that his former employer, Inframark LLC, singled him out for negative treatment due to his race and because he complained about his race. But the record after discovery tells a different story. Mr. Fletcher's job performance managing waste water plants led to written warnings, a Performance Improvement Plan, and ultimately his termination. And although Mr. Fletcher might have had a difficult, quick-tempered boss, he has not shown that anyone at the company acted based on his race or based on a complaint of racial discrimination. Because Mr. Fletcher cannot make out the elements of his claims, the Court will grant Inframark's summary judgment motion.

## I.    BACKGROUND

### A.    Mr. Fletcher's Work At Inframark

Mr. Fletcher began working for Inframark, which operates water and wastewater treatment facilities, in 1995. He became a project manager for the facility in Downingtown,

Pennsylvania, in 2015. In that role, he administered and oversaw management, operation, and maintenance activities.

In 2017, Michael Wolgemuth became Mr. Fletcher's Regional Manager. In October 2018, Mr. Fletcher submitted a budget late, and Mr. Wolgemuth issued him a Written Warning. In Spring 2019, Mr. Wolgemuth assigned Mr. Fletcher to supervise an additional plant in Wawa, Pennsylvania. Prior project managers at Wawa included Scott Thomas, who Inframark terminated for running the facility poorly, and Nathan Laucks, who Inframark reassigned to another location. (There is some inconsistency in the record as to whether Mr. Thomas or Mr. Laucks was Mr. Fletcher's immediate predecessor.) Both Mr. Thomas and Mr. Laucks are White. In October 2019, after Mr. Fletcher assumed his expanded responsibilities, Mr. Wolgemuth put Mr. Fletcher on a Performance Improvement Plan. According to the PIP, Mr. Fletcher needed to improve his project, client, and employee management skills. During the meeting about the PIP, Mr. Wolgemuth yelled and cursed at Mr. Fletcher. Mr. Wolgemuth also gave Mr. Fletcher a poor performance review.

Throughout Mr. Fletcher's supervision of Downingtown and Wawa, the facilities had "controllable" violations, meaning violations that result in some sort of disciplinary action. The Parties have not explained what happened during each controllable violation; they have only provided statistics. Mr. Fletcher oversaw facilities with fifteen controllable violations in 2019: fourteen occurred from June 5, 2019, to June 18, 2019, at Wawa; and one occurred on September 30, 2019, at Downingtown. He oversaw facilities with five

more controllable violations in 2020: one each on February 6 and February 7 at Wawa; and three on April 13, June 12, and July 10, respectively, at Downingtown. In early 2020, the Wawa facility ran out of sulfuric acid twice, though it is not clear if those constitute controllable violations. Mr. Fletcher had supervisory responsibility over the stock of sulfuric acid, but Mr. Fletcher explained that he delegated those responsibilities to his subordinates. Other supervisors also had controllable violations. Mr. Laucks oversaw a facility that had six violations in 2017 and one in 2020.

On February 7, 2020, Mr. Wolgemuth removed Mr. Fletcher from the Wawa plant, though Mr. Fletcher remained project manager at Downingtown. Then, Mr. Fletcher failed to complete a data report on time, so Inframark sent him another Written Warning. In June 2020, the Downingtown facility exceeded its chlorine limit. Mr. Fletcher was asked to conduct testing beginning on July 7, 2020, but he did not start testing until July 9. On either July 15 or 16, 2020, Stephanie Taylor, the Human Resources Business Partner assigned to Mr. Wolgemuth's region, and Mr. Wolgemuth terminated Mr. Fletcher. John Wilson, who is White, replaced Mr. Fletcher as the plant manager Wawa and Downingtown plant manager.

### B.   Complaints To Management

Mr. Fletcher complained about Mr. Wolgemuth's behavior and decision to place him on a PIP. He complained to Jerry Shupe, Mr. Wolgemuth's supervisor, Marnie Vaughn, the Vice President of Human Resources, and Ms. Taylor. Mr. Fletcher told Mr. Shupe that

he "didn't agree with the PIP" and "had issues" with both the content of the PIP and "some of the comments that were made" at the PIP meeting. (ECF No. 25-4 at 28.) He told Ms. Vaughn that he was "concerned about the wording in the PIP" and "didn't think it was fair." (*Id.* at 29.) Later, when Inframark converted the PIP to a "Success Plan"—part of an Inframark initiative—Mr. Fletcher again complained about the substance of the Success Plan to Mr. Wolgemuth, Mr. Shupe, Ms. Vaughn, and Ms. Taylor. He never raised race as a concern in those complaints. He did complain to his staff about racial discrimination, but he also took steps to make sure that the staff did not relay those concerns to management.

### C. Procedural History

On December 1, 2020, Mr. Fletcher dual-filed an administrative charge with the EEOC and PHRC, alleging race discrimination and retaliation. On June 2, 2021, Mr. Fletcher filed this action, asserting claims for race discrimination in violation of Title VII and the PHRA (Counts I and II) and retaliation under Title VII and the PHRA (Counts III and IV). After discovery, Inframark moved for summary judgment on each of Mr. Fletcher's claims.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw

reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted). The movant is entitled to judgment as a matter of law when the non-moving party fails to make such a showing. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A plaintiff may not rely on evidence to overcome summary judgment that would not be admissible at trial. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009).

## III.    ANALYSIS

Mr. Fletcher's discrimination and retaliation claims, whether arising under Title VII or the PHRA, are subject to the three-step burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Burton v. Teleflex Inc.*, 707 F.3d 417, 425–26 (3d Cir. 2013) (discrimination); *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017) (retaliation). Under this framework, an employee must first establish a *prima facie* case of discrimination or retaliation. *See Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (*per curiam*). If the employee makes out a *prima facie* case, the employer then has a burden of production (but not persuasion) to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. *Id.* If the employer articulates a legitimate reason, the employee must then proffer evidence

to allow a reasonable factfinder to find by a preponderance of the evidence that the employer's proffered reasons are false or pretextual. *See id.*

**A.** *Prima Facie* **Case**

    **1.** **Discrimination**

To establish a *prima facie* case of discrimination, the claimant must demonstrate, by a preponderance of the evidence, that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated persons who are not members of the protected class more favorably, or that the circumstances of his termination give rise to an inference of discrimination. *See Sarullo*, 352 F.3d at 797. Inframark only disputes whether Mr. Fletcher was qualified for his position and whether the circumstances of his termination give rise to an inference of discrimination, so that is where the Court focuses its analysis.

Courts consider "objective job qualifications" to determine whether an employee is qualified. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir.1995) (citation omitted). Inframark selected Mr. Fletcher for a project manager role in 2015, and he remained in that role for several years. Drawing reasonable inferences in the light most favorable to Mr. Fletcher, these facts establish Mr. Fletcher had the objective qualifications for the role. The subjective inquiry into whether Mr. Fletcher was ineffective in this role (and thus unqualified) is an inquiry better left for pretext. *See id.*

As for the inference of discrimination, in the Third Circuit, it is generally enough for a plaintiff to show that his replacement was someone not in his protected class. *See, e.g.,* *Henderson v. Montgomery Cty. Comm. Coll.*, Civ. A. No. 19-1064, 2021 WL 3077456, at * 7 (E.D. Pa. July 21, 2021); *Jones v. Sch. Dist. of Phila.*, 19 F. Supp.2d 414, 418 (E.D. Pa. 1998); *see also Anderson v. Wachovia Morrg. Corp.*, 621 F.3d 261, 272 (quoting *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 939 (3d Cir. 1997)). Because Inframark replaced Mr. Fletcher with Mr. Wilson, who is White, Mr. Fletcher has satisfied this element of his *prima facie* case as well.

### 2. Retaliation

To establish a *prima facie* case of retaliation the claimant must demonstrate that (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the participation in the protected activity and the adverse action. *See Nelson v. Upsala College*, 51 F.3d 383, 386 (3d Cir. 1995). Inframark does not dispute that Mr. Fletcher suffered an adverse employment action.

Protected activity includes formal charges of discrimination as well as informal protests of discriminatory employment practices such as complaints to management. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3rd Cir. 2015) (quoting *Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)). What matters is the message, "not the medium of conveyance." *Id.* (quotation omitted). The individual must complain of discrimination based on a protected category, such as age or race. *See*

*id.* (citing *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 266–67 (3d Cir. 2006)). A general complaint of unfair treatment is not "protected activity." *Slagle*, 435 F.3d at 267–68.

To show a causal connection, a plaintiff must show either an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action or a pattern of antagonism coupled with timing to establish a causal link. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). A "pattern of antagonism" is a consistent and continuous pattern of conduct, which can include a constant barrage of written and verbal warnings, as well as disciplinary action. *See Bartos v. MHM Corr. Servs., Inc.*, 454 F. App'x 74, 79 (3d Cir. 2011) (citing *Robinson v. Se. Pennsylvania Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 895 (3d Cir. 1993)). As part of this analysis, a plaintiff must show that decisionmakers had knowledge of the protected activity at the time of the adverse action. *See Daniels*, 776 F.3d at 196–97.

Mr. Fletcher engaged in protected conduct when he complained to his staff that his race impacted his treatment. However, Mr. Fletcher has no evidence that any decisionmaker knew about his complaints at the time of his termination. To the contrary, he says that he made sure no one relayed his concerns to his superiors. He therefore has not shown a causal connection, and therefore has not made out a *prima facie* case as to those complaints.

Mr. Fletcher has not shown that he engaged in protected activity when he complained to supervisors about Mr. Wolgemuth's behavior or the PIP/Success Plan

because he never mentioned or suggested that race played a role. He never filed formal charges of discrimination or made informal protests of discriminatory practices. He complained to Mr. Shupe and Ms. Vaughn about the way Mr. Wolgemuth treated him and to Mr. Shupe, Ms. Vaughn, and Ms. Taylor about the content of the PIP/Success Plan. But not every complaint constitutes protected activity. The undisputed evidence shows that he complained about Mr. Wolgemuth's boorish behavior. Although Mr. Fletcher did not need to use a magic word like "discrimination" or "race," he said nothing to put anyone on notice that he was making a complaint about race-based treatment. As a result, the complaints do not constitute protected activity. *See Daniels*, 776 F.3d at 195.

Even if Mr. Fletcher's complaints to supervisors qualified as protected activity, he has not shown a causal connection to his termination. His termination did not occur in close temporal proximity to any of his complaints. He argues Mr. Wolgemuth's "continued push of the [PIP] is the causal link to the complaint." (ECF No. 26-1 at 11.) But Mr. Wolgemuth gave Mr. Fletcher negative performance evaluations both before and after Mr. Fletcher complained about Mr. Wolgemuth. In fact, Mr. Wolgemuth issued Mr. Fletcher a Written Warning and placed him on the PIP before Mr. Fletcher made any complaints. Because Mr. Wolgemuth's push of the PIP began before Mr. Fletcher's complaints, it does not create a causal connection to Mr. Fletcher's complaints. *See Shaner v. Synthes*, 204 F.3d 494, 504–05 (3d Cir. 2000).

### B.    Legitimate, Nondiscriminatory Reason

Inframark says that it terminated Mr. Fletcher because of "poor performance." (ECF No. 25-1 at 12.) This constitutes a legitimate, non-discriminatory reason.

### C.    Pretext

The pretext stage of the analysis is the same for discrimination and retaliation claims. To survive summary judgment, a plaintiff must offer evidence from which a factfinder could reasonably "either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). To satisfy the first prong of the *Fuentes* test, a plaintiff cannot "simply show that the employer's decision was wrong or mistaken." *Id*. Rather, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' . . . and hence infer 'that the employer did not act for the asserted non-discriminatory reasons.'" *Id*. at 765. The Third Circuit has commented that pretext is difficult to establish. *See id*.

Mr. Fletcher has not satisfied his burden. Mr. Fletcher points to two facts to establish pretext: (1) Mr. Fletcher was fired after three controllable violations, but Mr. Laucks, who also had controllable violations, was not; and (2) Mr. Wolgemuth's "disparaging and disparate treatment" of Mr. Fletcher, the only Black subordinate. (ECF

No. 26-1 at 9–10.) Neither would permit a reasonable factfinder to disbelieve Mr. Wolgemuth's reasons for termination or believe that an invidious discriminatory reason was the motivating cause of Mr. Fletcher's termination.

The identification of a similarly-situated individual outside of the protected class who engaged in the same conduct as plaintiff but was treated more favorably might suggest pretext. *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir.1998); *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013). To be proper comparators, these other employees must have been "similarly[ ] situated in all respects." *In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018) (quote omitted). Employees are similarly situated in all respects when they held the same job or responsibilities, shared the same supervisor or had the same decision-maker involved in a decision about their employment, have comparable violation histories, and engaged in "nearly identical" conduct. *Doe v. Apria Healthcare Group, Inc.*, 97 F. Supp. 3d 638, 645 (E.D. Pa. 2015) (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259–61 (5th Cir. 2009)); *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881–82 (3d Cir. 2011).

Mr. Fletcher and Mr. Laucks were not similarly situated. Both had controllable violations, but Mr. Fletcher had 20 controllable violations: 15 in 2019; and five more in 2020. Mr. Laucks, on the other hand, had only seven: six in 2017; and one three years later in 2020. Mr. Laucks and Mr. Fletcher held the same position and reported to Mr. Wolgemuth, but Mr. Fletcher has provided no evidence (or any information at all) to

11

suggest that the controllable violations were comparable, such that Mr. Laucks should have been terminated as Mr. Fletcher was. The fact that Mr. Fletcher had nearly three times as many violations over a shorter span means they are not comparable.

Nothing else before the Court would permit a juror to disbelieve Inframark's explanation for Mr. Fletcher's termination. Mr. Fletcher concedes that others corrected issues in his reports, he failed to complete a report on time, and he supervised facilities that had controllable violations.

There is also no evidence suggesting that discrimination was the real cause of the termination. Mr. Fletcher alleges that Mr. Wolgemuth treated him "more harshly" and "singled him out for a success plan," as compared to his White colleagues. (ECF No. 26-1 at 3.) But he cites to no evidence in the record (nor has the Court found any) to suggest Mr. Wolgemuth treated others better despite similar performances. Mr. Fletcher speculates that, as Mr. Wolgemuth's only Black subordinate, Mr. Wolgemuth treated him differently and terminated him because of his race. But at this stage of the proceedings, speculation is not enough. *See Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 414 (3d Cir. 1999). Mr. Fletcher needs some evidence to establish pretext, and he has none.

## IV. CONCLUSION

Mr. Fletcher has failed to demonstrate the existence of essential elements of his claims for disparate treatment and retaliation. The Court will therefore grant Inframark's Motion. An appropriate Order follows.

BY THE COURT:

*/s/ Joshua D. Wolson*
**JOSHUA D. WOLSON, J.**

July 29, 2022